[Cite as *State v. Watson*, 2009-Ohio-6713.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,                   CASE NO. 14-09-01

    v.

BRADLEY WATSON,                       O P I N I O N

    DEFENDANT-APPELLANT.


Appeal from Marysville Municipal Court
Trial Court No. 08CRB667

**Judgment Affirmed**

**Date of Decision: December 21, 2009**


APPEARANCES:

    *Eric J. Allen* for Appellant

    *Tim M. Aslaner* for Appellee

**ROGERS, J.**

{¶1} Defendant-Appellant, Bradley Watson, appeals the judgment of the Marysville Municipal Court convicting him of obstructing official business. On appeal, Watson argues that the trial court erred in overruling his motion to suppress; in limiting his right to present a defense; in overruling his Rule 29 motion for acquittal; in violating its duty of impartiality; and, in overruling his motion for a new trial. Additionally, Watson argues that his conviction for obstructing official business was against the manifest weight of the evidence. Based upon the following, we affirm the judgment of the trial court.

{¶2} In June 2008, Watson was charged via complaint with obstructing official business in violation of R.C. 2921.31, a misdemeanor of the second degree. The complaint stemmed from an incident on June 14, 2008, during which Watson allegedly refused to comply with a police officer's order that he not reach inside his briefcase.

{¶3} In July 2008, Watson entered a plea of not guilty to the offense as charged.

{¶4} In August 2008, Watson filed a motion to suppress all statements taken from or made by him and all physical evidence relating to the incident on the basis that his detention was unlawful.

{¶5} On September 12, 2008, the trial court held a hearing on Watson's motion to suppress, at which the following testimony was heard.

{¶6} Officer Chris Diehl of the Marysville Police Department testified that, on June 14, 2008, around 9:50 p.m., he was patrolling Marysville in a marked cruiser when he received a dispatch that an identified citizen had reported that a man at the third house on the right of Mill Wood Boulevard was carrying a fully automatic assault rifle with a large "banana clip", or magazine; that the dispatcher described the individual as a bald male, approximately 6'4" tall, and wearing a white t-shirt; that Mill Wood Boulevard is in a Union County residential subdivision called "Mill Valley" containing more than five-hundred houses; that he proceeded to the subdivision and passed two men, both approximately 5'8" or 5'9", one of which was bald and wearing a white t-shirt; that neither of those men were carrying anything; that he continued into the subdivision and observed another man, Watson, sitting on a bench; that, when he approached Watson, he did not have his siren or lights on and had not made any verbal contact with him; that Watson looked at him, stood up "rather abruptly," picked up a black briefcase, and began walking across the street away from the cruiser towards an area approximately two houses down from where the suspect was reported to be (hearing tr., p. 17); that Watson was approximately 6'3", had short gray hair and no facial hair, was wearing a white t-shirt, and had the black briefcase over his

shoulder; that he approached Watson because "he fit the description of the * * * the initial call. That's the clothing, the height. Everything fit minus the bald" (Id. at 25); that he stopped the cruiser even though Watson was not bald because "from his actions it caught my attention enough to realize that that was out of the norm for me for just seeing a police cruiser in the area" (Id. at 19); that the briefcase Watson was carrying was approximately twenty-four inches long and twenty inches deep; that he asked Watson to stop, but he continued walking; that he again asked Watson to stop, but Watson turned around and told him that "he wasn't going to listen to me. That he didn't * * * do a f***ing thing" (Id. at 20); that Watson commented that he was not going to stop and appeared very upset because he crossed his arms and put his hands on his hips; that he asked Watson to "drop the bag" or "set the briefcase down" repeatedly (Id. at 21, 32); that Watson grabbed the handles of the briefcase, raised the it in the air, and then threw it on the ground; that Watson said "I hope you're happy. That was a $4,000 f***ing computer" (Id. at 21); that Watson asked him what he was being stopped for, and he replied that he was investigating a report of a man with an assault rifle; that Watson replied "there hasn't been an assault rifle in Union County since 1972" (Id. at 22); that he asked Watson to step away from the briefcase and sit on the curb at least four or five times until he complied; that, after sitting on the curb, Watson then got up and pulled the briefcase over beside him; that he told Watson

to stay away from the briefcase several times; that Sergeant Nichol arrived at that point; that he was concerned about Watson having contact with the bag because of Watson's belligerent, uncooperative demeanor, actions, and words; that he could not see inside the briefcase at that point; that he was aware from weapons training that some weapons have collapsible stocks; that Watson's statement about there being no assault rifles in Union County demonstrated his knowledge of assault rifles, leading him to believe that Watson may have been armed; that, despite orders to desist from both him and Sergeant Nichol, Watson grabbed the briefcase, unzipped it, and put his hands wrist-deep into it; that Sergeant Nichol fired his Taser on Watson; that he arrested Watson, who was subsequently charged with obstructing official business; and, that he believed Watson impeded and hampered his duty to conduct an investigation because he delayed him, refused to respond to his questions, and was uncooperative with his words and actions.

{¶7} On cross-examination, Officer Diehl testified that the description he received of the suspect was a bald man carrying an assault rifle with a large banana clip; however, Watson had hair and was not carrying an assault rifle; that, because Watson was not in custody at the time he initially approached him, Watson was not required to speak with him or answer any of his questions; and, that he did not see an assault rifle or large banana clip anywhere on or around Watson or see anything sticking out of the briefcase.

{¶8} Sergeant Ron Nichol of the Marysville Police Department testified that, on June 14, 2008, he was called to investigate a report of a bald white male wearing a white t-shirt, approximately "6 foot something," and standing in a driveway holding an assault rifle; that en route he came upon Officer Diehl and Watson, who was standing on the curb with a black bag laying beside him; that Watson appeared to be agitated; that he approached Watson with his Taser and told him to sit on the curb so they could talk to him; that Watson said "shoot me. The police in Columbus would do that" (Id. at 47); that Watson sat down on the curb beside the bag and attempted to reach for the bag; and, that he told Watson not to touch the bag.

{¶9} Watson testified that he lived in the Mill Valley subdivision in Marysville, Union County; that he was a professor at Franklin University and had possession of a laptop belonging to the University; that, on June 14, 2008, he took a walk carrying that work computer in a computer bag for about four and one-half miles and then stopped to sit on a bench about three-quarters of a mile from his home because he was tired; that he saw a police cruiser enter the neighborhood and turn off its overhead lights and sirens, so he got up and began to cross the street to return to his home; that the police car stopped and the officer gestured at him to get his attention; that he turned to the officer and said, "why are you stopping me?" (Id. at 75); that the officer told him he wanted to ask him some

questions and explained that he was looking for an individual who was 6'4", wearing a white t-shirt, and carrying an assault rifle in the area; that the officer did not mention that the suspect was bald; that he was not bald, and that he had a beard on the evening of the incident; that Watson replied, "that's a lie. There's nobody around here that's going to be walking up and down this road with an AK[-]47. There probably hasn't been one in this town at least for 30 years" (Id. at 76); that the officer became "irate" and said "I want you to sit down on that curb now and get – and put your hands behind your back and before you do that * * * throw your bag far away from you" (Id. at 76-77); that he felt as if he could not leave; that he threw the bag away from him, saying "now are you happy? That's a $4,000 computer. * * * And it's probably now broken" (Id.); that cars were passing on the street so he pulled the bag closer to him so that a car would not run over it; that Officer Diehl was not asking him any questions, just telling him to stay away from the bag; that he was worried the computer was damaged because it did not belong to him, so he reached both hands into the briefcase to pull out the computer; that Officer Nichol fired his Taser on him at that point; that neither officer ever told him he was under arrest; and, that he believed the officers were harassing him and he was upset.

{¶10} Thereafter, the trial court denied Watson's motion to suppress, finding that:

Case No. 14-09-01

> **Officer Diehl had an articulable reasonable basis to temporarily detain [Watson]. Officer Diehl received a call that a man was carrying a fully automatic assault rifle in a residential neighborhood in Marysville, and [Watson] was an adult white male approximately 100 yards away from where the gunman was reported. He was close to 6ft. 4in. tall and was wearing a white t-shirt. He was carrying a black bag which Officer Diehl testified was capable of containing a weapon, and he further displayed unprovoked evasive action toward the Officer prior to the Officer making any verbal or physical contact with him.**
>
> **Further, after the Officer stopped and temporarily detained [Watson], because of the aforementioned factors and because of [Watson's] refusal to stay away from his black bag and his continued evasiveness, the Officer had probable cause to arrest the Defendant for obstruction of official business when he tried to enter the black bag.**

(Journal Entry, pp. 2-3).

{¶11} On September 22, 2008, the case proceeded to jury trial, at which testimony was heard substantively the same as that heard during the suppression hearing. Thereafter, the jury found Watson guilty of obstructing official business. The trial court sentenced Watson to a thirty-day jail term, with twenty-nine days suspended, and three years of probation. Additionally, the trial court ordered Watson to complete forty-eight hours of community service and pay a $300 fine, with $150 suspended.

{¶12} In October 2008, Watson moved for a new trial on the basis of alleged irregularity of the proceedings; the trial court's biased statements; misconduct by several State witnesses; and, insufficiency of the evidence.

{¶13} In December 2008, the trial court overruled Watson's motion for a new trial.

{¶14} It is from his conviction and the denial of his motion for a new trial that Watson appeals, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION TO SUPPRESS**

*Assignment of Error No. II*

**THE TRIAL COURT ERRED IN LIMITING THE APPELLANT'S RIGHT TO PRESENT A DEFENSE**

*Assignment of Error No. III*

**THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION FOR RULE 29 ACQUITTAL**

*Assignment of Error No. IV*

**THE COURT ERRED IN VIOLATING ITS DUTY OF IMPARTIALITY**

*Assignment of Error No. V*

**THE CONVICTION IN THIS MATTER WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE**

*Assignment of Error No. VI*

**THE TRIAL COURT ERRED IN OVERRULING THE APPELLANTS [SIC] MOTION FOR NEW TRIAL**

{¶15} Due to the nature of Watson's assignments of error, we elect to address his third and fifth assignments of error together.

*Assignment of Error No. I*

{¶16} In his first assignment of error, Watson argues that the trial court erred when it overruled his motion to suppress. Specifically, Watson contends that the State failed to establish that Officer Diehl had specific and articulable facts which warranted his detention, as the description of the suspect with the assault rifle was a bald man, and Watson was not bald or carrying an assault rifle; and, that it is not illegal for an individual to possess a fully automatic assault rifle. We disagree that Officer Diehl lacked reasonable articulable suspicion to detain Watson.

{¶17} "Appellate review of a decision on a motion to suppress evidence presents mixed questions of law and fact." *State v. Dudli*, 3d Dist. No. 3-05-13, 2006-Ohio-601, ¶12, citing *United States v. Martinez* (C.A.11, 1992) 949 F.2d 1117. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson* (2000), 137 Ohio App.3d 847, 850. Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶100,

citing *State v. Fanning* (1982), 1 Ohio St.3d 19, 20. The appellate court must then review the application of the law to the facts de novo. *Roberts*, supra, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶8.

{¶18} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit unreasonable searches and seizures. Neither the Fourth Amendment nor Section 14, Article I explicitly requires that violations of its provisions against unlawful searches and seizures be remedied by suppression of evidence obtained as a result of such violation, but the United States Supreme Court has held that the exclusion of evidence is an essential part of the Fourth Amendment. *Mapp v. Ohio* (1961), 367 U.S. 643, 649.

{¶19} At a suppression hearing, the State bears the burden of establishing that a warrantless search and seizure falls within one of the exceptions to the warrant requirement, *City of Xenia v. Wallace* (1988), 37 Ohio St.3d 216, at paragraph two of the syllabus; *State v. Kessler* (1987), 53 Ohio St.2d 204, 207, and that it meets Fourth Amendment standards of reasonableness. *Maumee v. Weisner*, 87 Ohio St.3d 295, 297, 1999-Ohio-68, citing 5 LaFave, Search and Seizure (3 Ed.1996), Section 11.2(b).

{¶20} When a law enforcement officer accosts an individual and restricts his freedom of movement, the Fourth Amendment is implicated. *State v. Stephenson*, 3d Dist. No. 14-04-08, 2004-Ohio-5102, ¶16, citing *Terry v. Ohio*

(1968), 392 U.S. 1, 16. Generally, in order for a law enforcement officer to conduct a warrantless search, he must possess probable cause, which means that "'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *State v. Carlson* (1995), 102 Ohio App.3d 585, 600, quoting *Illinois v. Gates* (1983), 462 U.S. 213, 214.

{¶21} Even where probable cause is lacking, it is well-established that a law enforcement officer may temporarily detain an individual where he has a reasonable articulable suspicion that the individual is engaging in or is about to engage in criminal activity. *State v. Bobo* (1988), 37 Ohio St.3d 177, 179, citing *Terry*, 392 U.S. at 21. Such detention may be referred to as investigatory detention or a "Terry" stop. Reasonable articulable suspicion is "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" *Stephenson*, 2004-Ohio-5102, at ¶16, quoting *Bobo*, 37 Ohio St.3d at 178. "'[S]pecific and articulable facts' that will justify an investigatory stop by way of reasonable suspicion include: (1) location; (2) the officer's experience, training or knowledge; (3) the suspect's conduct or appearance; and (4) the surrounding circumstances." *State v. Gaylord*, 9th Dist. No. 22406, 2005-Ohio-2138, ¶9, citing *Bobo*, 37 Ohio St.3d at 178-79; *State v. Davison*, 9th Dist. No. 21825, 2004-Ohio-3251, ¶6.

{¶22} Here, Watson argues that the State failed to establish that Officer Diehl had specific and articulable facts warranting his detention, as the description of the suspect with the rifle was a bald man, and Watson was not bald or carrying a rifle; and, that it is not illegal for an individual to possess a fully automatic assault rifle. However, Officer Diehl testified that the dispatch described the suspect as a bald male, approximately 6'4" tall, wearing a white t-shirt, carrying a fully automatic assault rife, at the third house on the right of Mill Wood Boulevard and that Watson was approximately 6'3" tall, wearing a white t-shirt, carrying a briefcase capable of containing a broken down assault rifle, and walking approximately two houses down from the third house on the right of Mill Wood Boulevard. Although there was a slight discrepancy between the suspect's description and Watson's appearance, we cannot find that this discrepancy taints Officer Diehl's investigatory stop of Watson. See *State v. Daniel*, 2d Dist. No. 22003, 2008-Ohio-3864, ¶17. In light of Watson's other characteristics meeting the description, and, additionally, Watson's abrupt attempted departure upon sight of Officer Diehl and subsequent belligerent demeanor, we find that Officer Diehl possessed reasonable articulable suspicion warranting an investigatory detention.

{¶23} Additionally, although Watson contends that Officer Diehl could not have had reasonable articulable suspicion to detain him because it is not illegal to possess a fully automatic assault rifle, we find this issue to be irrelevant. Officer

Diehl was responding to a report of a man in a residential subdivision carrying a fully automatic assault rifle with a large banana clip. Although these facts alone may not constitute an illegal act, they still give rise to a reasonable articulable suspicion that an individual is about to engage in or is engaged in criminal activity. See *Terry*, supra.

{¶24} Accordingly, we overrule Watson's first assignment of error.

*Assignment of Error No. II*

{¶25} In his second assignment of error, Watson argues that the trial court erred in limiting his right to present a defense at trial. Specifically, Watson contends that trial counsel attempted to argue during closing that a private citizen need not submit to the will of government officers, but that the trial court sustained an objection to this argument. Although the trial court's reason for this ruling does not appear in the transcript, Watson states that the trial court found that the determination it made regarding the suppression motion was dispositive of the issue of whether Watson's Fourth Amendment rights were violated.

{¶26} "'Considerable latitude is permitted in closing arguments, and the question is generally considered one falling in the first instance within the sound discretion of the trial court." *State v. Hall*, 3d Dist. No. 14-84-6, 1985 WL 7339, quoting *State v. Pustare* (1978), 33 Ohio App.2d 305, 312. As such, "[t]he trial

court's actions are not overturned absent a showing of abuse of that discretion.'" Id., citing *State v. Turner*, 3d Dist. No. 7-83-9, 1984 WL 8104.

**{¶27}** "The principal limitation on the closing argument is that it be confined to evidence adduced at the trial." Id., citing 27 Ohio Jurisprudence 3d (1981) 177, Criminal Law, Section 947. Additionally, although counsel enjoys considerable latitude in closing argument, "[i]t is improper * * * for counsel for the accused to discuss the law of the case to the jury, and the court may properly prevent counsel from doing so." 29 Ohio Jurisprudence 3d (2009), Criminal Law, Section 2676, citing *Fry v. State* (1932), 43 Ohio App. 154, 156. See, also, *State v. Sherrils*, 8th Dist. No. 41302, 1980 WL 354974, citing *State v. Myers* (1971), 26 Ohio St.2d 190.

**{¶28}** Here, we find that Watson's counsel's closing argument discussing limitations on police officers' conduct towards private citizens departed from the evidence adduced at trial, and attempted to argue the law of the case to the jury. As this type of argument was improper, the trial court did not err in sustaining the State's objection to the argument.

**{¶29}** Accordingly, we overrule Watson's second assignment of error.

*Assignment of Error Nos. III & V*

**{¶30}** In his third assignment of error, Watson argues that the trial court erred in overruling his Crim.R. 29 motion for acquittal. Specifically, Watson

contends that the State failed to prove that he obstructed official business because a person cannot be guilty of this offense merely by doing nothing or failing to act; because Watson did not act purposely, as he testified he merely wanted to go home; and, because there was no evidence that he impeded the police from proceeding to the address where the alleged gunman was reported. Additionally, in his fifth assignment of error, Watson argues that his conviction was against the manifest weight of the evidence. Specifically, Watson contends that, had he been allowed to walk home, there would have been no complaint filed for obstructing official business, and that the officers testified they would have stopped him regardless of what was in his briefcase.

**{¶31}** Under Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt. *State v. Bridgeman* (1978), 55 Ohio St.2d 261. A motion for acquittal tests the sufficiency of the evidence. *State v. Miley* (1996), 114 Ohio App.3d 738, 742.

**{¶32}** When an appellate court reviews a record for sufficiency, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d

384, 392, 2005-Ohio-2282, citing *State v. Jenks* (1981), 61 Ohio St.3d 259, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 1997-Ohio-355. Sufficiency is a test of adequacy, *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, and the question of whether evidence is sufficient to sustain a verdict is one of law. *State v. Robinson* (1955), 162 Ohio St. 486, superseded by state constitutional amendment on other grounds as stated in *Smith*, supra.

{¶33} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175. Only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.

{¶34} The trial court convicted Watson of obstructing official business in violation of R.C. 2921.31, which provides:

> **No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity,**

**shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.**

R.C. 2921.31(A). As used in this statute, R.C. 2901.22(A) provides that "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." Additionally, this Court has previously identified five essential elements within R.C. 2921.31: "(1) an act by the defendant; (2) done with the purpose to prevent, obstruct, or delay a public official; (3) that actually hampers or impedes a public official; (4) while the official is acting in the performance of a lawful duty; and (5) the defendant does so act without a privilege to do so." S*tate v. Brickner-Latham*, 3d Dist. No. 13-05-26, 2006-Ohio-609, ¶25 citing R.C. 2921.31(A); *State v. Dice*, 3d Dist. No. 9-04-41, 2005-Ohio-2505, ¶19. Finally, this Court and other courts have emphasized that "one cannot be guilty of obstructing official business by doing nothing because the text of R.C. 2921.31 specifically requires an offender to act." *Brickner-Latham*, 2006-Ohio-609, at ¶26, citing *State v. Justice*, 4th Dist. No. 99CA631, 1999 WL 1125113.

**{¶35}** Courts have found evidence sufficient to sustain convictions for obstructing official business where a defendant fled from an officer's lawful request for an investigatory detention, *State v. Certain*, 4th Dist. No. 07CA3003,

2009-Ohio-148; where an officer initiated a lawful investigatory detention, and the defendant refused to exit his vehicle and repeatedly reached under the seat, against the officer's orders, *State v. Dunfee*, 4th Dist. No. 02CA37, 2003-Ohio-5970; and, where an officer attempted to initiate a lawful investigatory detention of a defendant based on eyewitness statements that he caused a traffic accident, and the defendant abruptly walked away from the officer despite his orders to stop, *State v. Kates*, 169 Ohio App.3d 766, 2006-Ohio-6779.

{¶36} Here, Watson contends that the State failed to prove that he obstructed official business because a person cannot be guilty of this offense merely by doing nothing or failing to act; that he did not act purposely to prevent, obstruct, or delay the officers; and, that there was no evidence he impeded the officers from proceeding to the address where the alleged gunman was reported. While Watson's assertion that an individual cannot be guilty of this offense merely by doing nothing is correct, these are not the facts before us. Testimony was heard that Officers Diehl and Nichol repeatedly asked Watson to stay away from his briefcase and not to reach inside it, but Watson got up from the curb, pulled the briefcase over to him, unzipped it, and stuck his hands wrist-deep inside. This constituted an affirmative act sufficient to satisfy that element of R.C. 2921.31. Additionally, although, according to his testimony, Watson's intent may have been merely to assert his constitutional rights, it is undisputed that Officer

Diehl informed him that he was investigating reports of a man with an assault rifle in the area, and that he refused the officers' orders to stay away from his bag. Although Watson testified he believed the investigation was fabricated and the officers intended to harass him, his decision to disbelieve them, disobey their orders, and, in turn, to delay their investigation, was made at his own peril. Accordingly, we find that, from these facts, the trier of fact could reasonably infer that Watson purposefully obstructed the officers' investigation of the gunman and that the officers were delayed from their investigation due to his belligerent actions.

{¶37} Additionally, we cannot find from the evidence presented that Watson's conviction was against the manifest weight of the evidence. Both officers testified that Watson reached into his briefcase against their orders, and Watson himself admitted that, although Officer Diehl told him to stay away from the bag, he reached into it and began to pull out his computer. As this was the act constituting the offense, we cannot find that the fact finder clearly lost its way.

{¶38} Accordingly, we overrule Watson's third and fifth assignments of error.

*Assignment of Error No. IV*

{¶39} In his fourth assignment of error, Watson argues that the trial court violated its duty of impartiality. Specifically, Watson contends that the trial court

plainly erred because it made a comment suggesting the prosecutor should have made an objection to certain testimony, and, because the trial court commented on the unavailability of a defense witness because he was outside smoking a cigarette. We disagree.

{¶40} Under Evid.R. 611, the trial court has discretion to control the flow of the trial, including "mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 611(A). Additionally, the trial court has a duty to maintain an appearance of impartiality, and a trial judge may not advocate for or materially assist one party at the expense of the other. *Mentor-on-the-Lake v. Giffin* (1995), 105 Ohio App.3d 441, 449; *Disciplinary Counsel v. O'Neill*, 103 Ohio St.3d 204, 2004-Ohio-4704, ¶13.

{¶41} Because a trial court's power to control the flow of trial pursuant to Evid.R. 611 is within its discretion, an appellate court may not reverse on this issue absent an abuse of discretion. *Mentor-on-the-Lake*, 105 Ohio App.3d at 448, citing *State v. Prokos* (1993), 91 Ohio App.3d 39, 44. Additionally, the failure to object to such alleged errors at trial waives all but plain error. Crim.R. 52(B); *State v. Johnson* (1999), 134 Ohio App.3d 586, 590, citing *State v. Wade* (1978), 53 Ohio St.2d 182, 188, reversed on other grounds. In order to have plain error

under Crim.R. 52(B) there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68. Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Id. Plain error exists only in the event that it can be said that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431, 1997-Ohio-204; see *State v. Johnson*, 3d Dist. No. 2-98-39, 1999-Ohio-825.

{¶42} Here, Watson objects to the following dialogues that took place at trial during Watson's redirect examination of Curt Watson-Weeks and immediately thereafter, respectively:

> **[WATSON'S COUNSEL:] Okay. And this problem that they've been having with your brother, this is something that causes them great heartbreak and sadness, isn't it?**
> **[THE WITNESS:] Yes. It's actually – we've separately all four of us, me and my wife –**
> **THE COURT: I guess I'd sustain an objection as to the relevance of this line of questioning.**
> **[THE STATE]: I would make an objection.**
> **THE COURT: Sustained. Go ahead, [Watson's counsel].**

(Trial Tr., p. 116).

> **[WATSON'S COUNSEL:] Call Robert Skinner, your Honor.**
> **BAILIFF: Robert Skinner. Apparently he stepped outside to have a cigarette.**
> **THE COURT: Well, he'd better – call your next witness, [counsel]. If that's your last witness, then you rest cause [sic] I'm not waiting for him. We've got ten people sitting in that**

**jury box and we're not going to wait for somebody to have a cigarette.**

(Trial Tr., p. 117).

{¶43} Initially, we note that, as to Curt Watson-Weeks' attempted testimony, trial counsel did not proffer what the testimony would have been, or state why it was being offered. Further, trial counsel did not object to either statement by the trial court of which he now complains. As such, he has waived all but plain error. See *Johnson*, supra.

{¶44} We find that the trial court's comment about the defense witness' unavailability because he was outside smoking did not create a manifest miscarriage of justice. Pursuant to Evid.R. 611, it was within the trial court's discretion to require Watson to move on to another witness in order to avoid needless consumption of time. Additionally, the trial court did not attempt to bar Skinner from testifying, and he was eventually called as a witness and testified; thus, Watson has not demonstrated that, absent the alleged error, the outcome of trial would have been otherwise. Similarly, we do not find that the trial court's suggestion that the State object to irrelevant testimony clearly prejudiced Watson, as the trial court has discretion to control the mode of interrogation so as to avoid needless consumption of time. In fact, a trial court need not wait for a motion from a party before stopping the presentation of irrelevant or repetitive testimony.

Such ability to control the presentation of evidence is inherent in the authority of the court.

**{¶45}** Accordingly, we overrule Watson's fourth assignment of error.

*Assignment of Error No. VI*

**{¶46}** In his sixth assignment of error, Watson argues that the trial court erred in overruling his motion for a new trial. Specifically, Watson contends that the trial court treated his trial as an "inconvenience," as apparent in its rulings, conduct at trial, and overruling of his motion for a new trial. Watson points to the trial court's prompting of the State to object to certain testimony and argues that the trial court "cut the legs out from under" the defense without basis or hearing.

**{¶47}** Motions for a new trial are governed by Crim.R. 33, and are addressed to the sound discretion of the trial court. Thus, a trial court's decision to deny such a motion will not be disturbed on appeal absent an abuse of discretion. *State v. Ray*, 3d Dist. No. 14-05-39, 2006-Ohio-5640, ¶53, citing *State v. Farley*, 10th Dist. No. 03AP-555, 2004-Ohio-1781, ¶¶6-7. "The term 'abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219.

**{¶48}** Although Watson's appellate brief complains that the record makes it apparent that his trial was a matter of inconvenience to the trial court and that

the trial court "cut the legs out from under" his defense, Watson provides no specific argument as to which facts he refers to, nor does he cite to the record, trial transcript, or any supporting authority. Pursuant to App.R. 16(A)(7) and App.R. 12(A)(2), this Court is not required to address arguments that have not been adequately presented for review or supported by proper authority; however, in the interests of justice, we elect to address Watson's argument, assuming that he refers to the trial court's overruling of his motion to suppress and Crim.R. 29 motion for acquittal; the trial court's suggestion that the State object to irrelevant testimony; and, trial court's limitations of his closing argument.

{¶49} As elucidated in our analysis of Watson's first, second, third, and fourth assignments of error, the trial court's overruling of his motion to suppress was proper because Officer Diehl possessed a reasonable, articulable suspicion sufficient to detain Watson; the trial court did not err in limiting Watson's closing argument discussion, as closing arguments are not appropriate for arguing law; the trial court did not err in overruling Watson's Crim.R. 29 motion for acquittal as sufficient evidence supported his conviction for obstructing official business; and, the trial court's statement that it would entertain an objection to irrelevant testimony was an appropriate exercise of its discretion to control the flow of the trial under Evid.R. 611. In light of these conclusions, we cannot find that the trial court abused its discretion in denying Watson's motion for a new trial.

**{¶50}** Accordingly, we overrule Watson's sixth assignment of error.

**{¶51}** Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**WILLAMOWSKI and SHAW, J.J., concur.**

**/jlr**